UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DAVEN A. PATTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-cv-00699-TWP-MJD |
| | ) | |
| INDIANA UNIVERSITY BOARD OF | ) | |
| TRUSTEES, | ) | |
| LORI REESOR, | ) | |
| INDIANA UNIVERSITY POLICE | ) | |
| DEPARTMENT Consolidated Party in 1:20-cv- | ) | |
| 1583-JRS-MJD, | ) | |
| MONROE COUNTY PROSECUTORS OFFICE | ) | |
| Consolidated Defendant in 1:20-cv-1583-JRS- | ) | |
| MJD, | ) | |
| REBECCA A. SCHUML Consolidated Defendant | ) | |
| in 1:20-cv-1583-JRS-MJD, | ) | |
| BOBBY THOMPSON Consolidated Defendant in | ) | |
| 1:20-cv-1583-JRS-MJD, and | ) | |
| JEFF KEHR Consolidated Defendant in 1:20-cv- | ) | |
| 1583-JRS-MJD, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court on Motions to Dismiss filed pursuant to Federal Rule of

Civil Procedure 12(b)(6) by Defendants Indiana University Board of Trustees ("IU"), Lori Reesor

("Reesor"), the Indiana University Police Department ("IUPD"), Rebecca A. Schmuhl[1]

("Schmuhl") (IU, Reesor, IUPD, and Schmuhl, collectively, the "IU Defendants") (Filing No. 102);

the Monroe County Prosecutor's Office ("Prosecutor's Office"), Jeff Kehr ("Kehr") (Prosecutor's

Office and Kehr, together, the "State Defendants") (Filing No. 112), and Bobby Thompson

---

[1] Schmuhl's last name is misspelled in the case caption and throughout the 4th Amended Complaint, but is corrected in this entry.

("Thompson") (Filing No. 105); (all defendants collectively, "Defendants"). *Pro se* plaintiff Daven A. Patton ("Patton") initiated this action against Defendants for their alleged violation of numerous federal statutes—42 U.S.C. § 1983 ("Section 1983"), Title VI of the Civil Rights Act of 1964 ("Title VI"), Title II of the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("Rehabilitation Act")—as well as for abuse of process, malicious prosecution, and defamation. After Patton amended his Complaint four times, Defendants filed Motions to Dismiss, asking the Court to dismiss each of the claims asserted in Patton's Fourth Amended Complaint (Filing No. 91-1). For the following reasons, the Court **grants** the State Defendants' Motion to Dismiss and **grants in part and denies in part** the IU Defendants' and Thompson's Motions to Dismiss.

## I.     BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of Patton as the non-moving party. *See Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

Patton initiated this action following his arrest and prosecution for terroristic mischief in 2016 and subsequent suspension from Indiana University Bloomington (the "University"), the denial of his petition for readmission to the University in 2018, and his arrest and prosecution for felony intimidation in 2018. Patton alleges the denial of his petition for readmission and 2018 arrest and prosecution were motivated by disability discrimination and retaliation for his First Amendment activities regarding his 2016 suspension, arrest, and prosecution. He brings claims against Indiana University Board of Trustees ("IU") as the representative body of the political subdivision of Indiana University; Ressor in her individual capacity as Vice Provost of IU; IUPD as a political subdivision of the University; Schmuhl individually and as an officer of IUPD;

Thompson individually and in his official capacity as an officer of IUPD; the Monroe County Prosecutor's Office; and Kehr in his individual and official capacity as a Deputy Prosecutor.

## A.    Patton's 2016 Arrest and Complaints of IUPD Misconduct

On March 3, 2016, Patton was a junior at the University when he placed a box containing books and his student identification card outside of a University building.  On the box, Patton wrote "Call the bomb squad, because this shit is mindblowing" (Filing No. 91-1 at ¶ 91). Predictably, someone reported the suspicious package, and the IUPD investigated it as a bomb threat.  Later that evening, several IUPD officers entered and searched Patton's apartment and arrested him.  Patton was charged with terroristic mischief, although the charges were later dismissed without prejudice.  *Id.* at ¶¶ 25, 91.  On March 8, 2016, IU suspended Patton, stating he posed a danger to himself or others.  *Id.* at ¶¶ 17–18.  Patton was permitted to apply for readmission on or after March 6, 2017.  *Id.* at ¶ 20.

In October 2017, Patton began sending emails to University officials criticizing his 2016 arrest and prosecution. On October 26, 2017, he sent an email to Vice Provost, Reesor, claiming IUPD's response to the bomb threat incident violated the Clery Act, 20 U.S.C. § 1092(f), because IUPD failed to send safety alerts regarding the suspicious package, and did not follow certain security protocols while searching his apartment.  *Id.* at 50.  Patton sent another email to Reesor on October 28, 2017, titled "Terroristic mischief is a thought crime. Your Police department is Orwellian," in which Patton compared his arrest to an incident at Purdue University, in which a student was arrested after leaving a "suspicious package" outside the campus visitor center.  *Id.* at 52.  Patton sent another email later that day quoting the Clery Act and again asserting that the IUPD had violated the Clery Act.  *Id.* at 54–56.  On March 2, 2016, Patton emailed IU that the United States Department of Education ("DOE") would be investigating IU for the alleged violations.  *Id.* at ¶ 26.  On March 3 and 4, 2018, Patton forwarded to a DOE official and Reesor,

respectively, a March 2016 email from a University student advocate group identifying what Patton describes as "abnormalities" in his 2016 suspension. *Id.* at 58.

**B.**     **Patton's Petition for Readmission**

A few days later, on March 12, 2018, Patton submitted a petition for readmission to the University. *Id.* at 60–64.  He emailed his petition to IU and copied several DOE officials on the email.  Patton's petition detailed his 2016 arrest and again criticized the IUPD's conduct on the evening of his arrest.  He wrote about how he developed post-traumatic stress disorder ("PTSD") as a result of his arrest, but that he had worked with a therapist to overcome it. *Id.*  Patton also submitted a letter from his therapist describing the progress he had made. *Id.*  In his reinstatement petition, Patton maintained that the box of books was objectively not suspicious or threatening, and that the severity of IUPD's response and criminal charges were based on his race. *Id.*

On March 23, 2018, Patton sent yet another email to Reesor regarding the IUPD's alleged violations of the Clery Act, titled "Activists, student groups, and the department of education are on my side". *Id.* at 66–67.  Three days later, on March 26, 2018, Reesor denied Patton's petition for readmission. *Id.* at ¶ 32.  Reesor's denial letter stated Patton could submit another petition on or after May 2019, but that to be considered for readmission, Patton would need to continue seeing a counselor and submit a psycho-social assessment from a licensed mental health professional. *Id.* at ¶ 32.  Patton responded the same day, claiming that the denial of his readmission was discriminatory. *Id.* at 82.  Patton stated he intended to forward the denial of his application to the DOE Office of Civil Rights ("OCR") and the DOE Financial Student Aid Office's enforcement group. *Id.* at 81–82.

**C.**     **Patton's 2018 Emails**

Over the few next months, Patton sent approximately forty emails to University officials and the DOE.  On March 27, 2018, he emailed a complaint against IU to the OCR, stating he

4

believes he was "the victim of continuing and ongoing and discriminatory practices" by IU. *Id.* at 77–82. The next day, Patton sent three emails to Reesor regarding the OCR complaint, and in response, Reesor instructed Patton to direct his future emails to IU's counsel, Aimee Oestreich ("Oestreich"). *Id.* at 84–85. Patton then sent several emails in an attempt to informally resolve his OCR complaint with IU. On March 29, 2018, he emailed Oestreich, copying Reesor, offering to drop his OCR complaint and send IU a psycho-social examination in exchange for IU's agreement to readmit him and remove the suspension notation from his transcript. *Id.* at 87. On April 10, 2018, Patton sent another email urging that he and IU reach an agreement before the OCR began its investigation. *Id.* at 88. He followed up on April 14, 2018, giving IU until April 21, 2018 to accept his settlement offer. *Id.* at 92. Having received no response by April 21, 2018, Patton indicated he would be proceeding with his OCR complaint. *Id.* at 93.

The emails Patton sent over the next several weeks continued to discuss his Clery Act complaint, his OCR complaint, racial discrimination, and other political topics. After May 7, 2018 however, Patton began using more extreme and inflammatory language in his emails, often attaching propaganda images relating to communism, fascism, and racism. *Id.* at 113–155. Patton alleges his emails were an attempt to "troll" IU. He recites several dictionary definitions of "trolling," including "to antagonize (others) online by deliberately posting inflammatory, irrelevant, or offensive comments or other disruptive content." *Troll*, Merriam-Webster Dictionary (11th ed. 2020).

Patton's most concerning emails started on May 25, 2018, when he sent an email titled "I'm ready for this bullsh*t to be over with". *Id.* at 138. Patton's May 25, 2018 email begins with a reference to "trolling," stating that

> [r]anting, trolling, and the super hoax . . . are very good ways at relieving the truama [sic] your officers caused me and the truama [sic] Lori . . . is trying to cause me. I

5

will stop sending these emails once my complaint is resolved. Those are all benign manifestations of my 'disability'.

*Id.* at 138.  Near the end of the email, Patton says "ranting aside the school has not only let me down, but the community, the federal government, terrorists, and everyone who is not racist. I'm just trying to get my degree."  *Id.* at 141.  That email, however, also includes more menacing messages, including that Reesor will "regret [her] decision" and that "[w]hen the communists take over I will send her to the gulag and erect statutes of Lenin".  *Id.* at 139.

On June 1 and 2, 2018, Patton sent his most worrying emails.  Just before 9:00 p.m. on June 1, 2018, Patton sent an email to Reesor titled "I thought about killing you".  *Id.* at 147.  The body of the email states it "Is the name of one of Kanye West's newest tracks," and includes a link to the song "I Thought About Killing You".  *Id.*  Roughly thirty minutes later, he sent an email to Oestreich titled "The FBI might get involved," stating "[t]he cops [sic] lie violated a federal statute and they are the ones who started the super hoax. Someone should kill those pigs anyways [sic]…. Or they might just get blown up…. We are at war…. You have already stolen years of my life and I will show no mercy."  *Id.* at 149.  At approximately 12:30 a.m. on June 2, 2018, Patton sent another email to Oestreich, titled "The bloodbath is coming," in which Patton states, among other hyper-political statements, "Lying about a bomb being in a dorm room to falsely accuse me of terroristic mischief is an act of war. You should all be assassinated for being complicit."  *Id.* at 153.

Later on June 2, 2018, Schmuhl called Patton's grandparents and told them Patton was sending emails that were "threatening in nature".  *Id.* at ¶ 68.  That afternoon, Patton sent an email to Oestreich, which he also forwarded to Reesor, titled "The emails are not threats".  Patton explains "I am just trolling and frustrated. I am working with the OCR and will resume therapy. I

am just frustrated with the process and expressing myself. I apologize if you feel threatened. I am

not trying to make you do anything. The emails really are benign. I am peaceful." *Id.* at 156.

Patton followed up with another email that afternoon to Oestreich titled "Mental Illness is

an issue that needs more attention," stating that his emails were meant to bring awareness to mental

health issues. *Id.* at 157–158. Patton sent his last email to Oestreich and Reesor at roughly 4:00

p.m. on June 2, 2018. In his final email, Patton states he sent his earlier emails from the perspective

of an "online persona," but that he would never engage in violence. He states "I [sic] real life I am

using the dept of education. My beliefs are non-violent." *Id.* at 160.

**D.**    **Patton's 2018 Arrest and Prosecution for Felony Intimidation**

On June 5, 2018, Schmuhl signed a probable cause affidavit regarding Patton's

"threatening" emails. *Id.* at ¶ 76. According to the Fourth Amended Complaint, the probable

cause affidavit referred to communications between Patton and Reesor on only four dates: March

12, March 26, May 25, and June 1, 2018. *Id.* at ¶ 150. The affidavit states that on March 12, 2018,

Patton submitted his petition for readmission, on March 26, 2018, Reesor denied Patton's petition,

and later that day, Patton responded that the denial was "discriminatory" and that he would be

forwarding the email to the DOE Office of Financial Student Aid. *Id.* at ¶ 152. The affidavit then

refers to Patton's May 25, 2018 email, summarizing it as "subjected 'I'm ready for this bullsh*t to

be over with,'" describing Reesor as a racist, and stating "'She tried to screw me over but I predicted

that. F*ck her too. She will regret that decision in the future'". *Id.* at ¶ 153. The affidavit lastly

describes Patton's June 1, 2018 email, stating the email had the subject line "I thought about killing

you," and that "[i]n the email, Mr. Patton states the subject line is the title of a Kanye West song

and he provides a link to a Youtube video of the song'". *Id.* at ¶ 154.

On June 7, 2018, Thompson, another IUPD officer,[2] and Kehr, the Monroe County Prosecutor, signed a charging information charging Patton with felony intimidation of Reesor in violation of Indiana Code § 35-42-2-1.  ([Filing No. 113-2](#).)  Kehr filed the probable cause affidavit and charging information with the Monroe Circuit Court on June 11, 2018.  That same day, a Monroe Circuit Court judge signed a warrant for Patton's arrest.  *Id.* at 103-2.  Patton was arrested and prosecuted for felony intimidation, but the charges against him were voluntarily dismissed without prejudice on May 25, 2021.  *Id.* at 103-1.

Patton initiated this action by filing two lawsuits—one on March 3, 2020, against Reesor and IU, and one on June 8, 2020, against all Defendants.  The two cases were consolidated on July 20, 2020 ([Filing No. 31](#)).  Patton asserts sixteen claims against Defendants, alleging that the denial of his petition for readmission and his arrest and prosecution for felony intimidation violated his First and Fourth Amendment rights, Title VI, the ADA, the Rehabilitation Act, and state law. Patton has already amended his complaint four times, and as the Court has previously noted, he will not be permitted leave to file any further amendments ([Filing No. 100](#)).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

---

[2] Patton alleges Thompson is an IUPD officer ([Filing No. 91-1 at ¶ 9](#)). In his brief, Thompson states he is an investigator for the Prosecutor's Office, but at this stage, the Court must accept Patton's allegation as true.

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Additionally, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however unartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, the Court notes that:

> [I]t is also well established that pro se litigants are not excused from compliance with procedural rules. [T]he Supreme Court has never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel[.] Further, as the Supreme Court has noted, in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

*Loubser v. United States*, 606 F. Supp. 2d 897, 909 (N.D. Ind. 2009) (citations and quotation marks omitted).

## III.    DISCUSSION

In his 164 page Fourth Amended Complaint, Patton asserts the sixteen claims.[3] Count I: §1983 Free Speech Retaliation; Count II: Title VI Civil Rights Act; Count III: Title II ADA; Count IV: Sec. 504 Rehabilitation Act; Count V: §1983 1st Amendment Retaliatory Arrest; Count VI: §1983 First Amendment Retaliatory Prosecution; Count VII: §1983 4th Amendment False Arrest; Count VIII: §1983 Perjury; Count IX: §1983 Subordination of Perjury; Count X: Abuse of Process; Count XI: §1983 Conspiracy to Injure Using Unlawful Means; Count XII Civil Rights Act; Count XIII: Title II-ADA; Count XIV: Sec. 504 Rehabilitation Act; Count XV: Malicious Prosecution and Count XVI: Defamation.

Defendants raise a number of reasons why Patton's allegations should be dismissed.  They overarchingly argue that Patton has failed to adequately identify which claims he is pursuing against which Defendants. They also argue that his Section 1983, Title VI, ADA and Rehabilitation Act, and tort law claims should be dismissed for more particularized reasons.  The Court will first address the sufficiency of Patton's allegations identifying Defendants and then address the sufficiency of his Section 1983, Title VI, ADA and Rehabilitation Act, and tort law claims in turn.

### A.  Sufficiency of Allegations Against Each Defendant

Defendants argue that Patton's Fourth Amended Complaint does not adequately notify them of which claims have been asserted against each of them. Although Patton's Fourth Amended Complaint is by no means a model of clarity and it contains a very lengthy statement of the claims,

---

[3] Patton's Fourth Amended Complaint misnumbers the last six claims. Consistent with Defendants' briefing, the Court will renumber the following claims sequentially, for purposes of this Order: "Claim VI" for "Conspiracy to injure using unlawful means" (Filing No. 91-1 at ¶¶ 183–87) will be Count XI; "Claim XI" regarding "Civil Rights Act Title VI" (*Id.* at ¶¶ 188–92) will be Count XII; "Claims XII & XIII" regarding "Title II Americans with Disabilities Act & Section 504 of the Rehabilitation act" (*Id.* at ¶¶ 193–97) will be Counts XIII and XIV, respectively; "Claim XI" for "Malicouis [sic] prosecution" (*Id.* at ¶ 197) will be Count XV; and "Claim XII" for "Defamation" (*Id.*) will be Count XVI. All other claims will remain as numbered in the Fourth Amended Complaint.

for purposes of Federal Rule of Civil Procedure 8(a)—and being liberally construed—it sufficiently identifies who Patton believes is liable for each of the claims asserted.  His claims are based on two events: the denial of his petition for readmission, and his arrest and prosecution for intimidation.  His claims related to the denial of his petition for readmission, Counts I–IV, are brought against IU and its Vice Provost, Reesor (Filing No. 91-1 at ¶¶ 99, 104, 115–16).  Patton alleges each of the Defendants was involved in his arrest and prosecution, so Patton's remaining claims are asserted against all Defendants, except Counts XII–XIV under Title VI, the ADA, and the Rehabilitation Act, which are asserted against only IU and Reesor (Filing No. 91-1 at ¶¶ 127–31, 142–46, 164–67, 179–80, 182, 184, 191, 196–97).  Therefore, Patton's Counts I–IV and XII–XIV are brought against IU and Reesor, and his remaining claims, Counts V–XI and XV–XVI, are brought against all Defendants.

**B.**     **Patton's Section 1983 Claims—Counts I, V–IX, and XI**

Defendants argue Patton's Section 1983 claims should be dismissed for several reasons.  They primarily argue they are immune from Patton's Section 1983 claims. Defendants further argue Patton has not adequately alleged the absence of probable cause for his arrest.  Defendants also argue Patton's emails are not protected under the First Amendment and therefore cannot serve as the basis for First Amendment claims.  Lastly, they argue Patton has not sufficiently pled the elements of his claims.  The Court will address each of Defendants' arguments in turn.

**1.**     **Immunity**

Defendants assert they are entitled to various immunities with respect to Patton's Section 1983 claims.  They first argue Eleventh Amendment sovereign immunity applies to IU, the IUPD, and the Prosecutor's Office as state agencies, and to Reesor, Schmuhl, Thompson, and Kehr, in their official capacities, as state agency employees.  The IU Defendants further argue that Reesor and Schmuhl are entitled to sovereign immunity in their individual capacities because Patton's

claims are, in substance, against IU and the IUPD.  The State Defendants argue that they are entitled to prosecutorial immunity, and Thompson argues he is entitled to qualified immunity.

### a. <u>Sovereign Immunity as to IU, IUPD, and the Prosecutor's Office</u>

IU, IUPD, and the Prosecutor's Office argue they are agencies of the State of Indiana and therefore entitled to sovereign immunity under the Eleventh Amendment.  Defendants' position is well-supported by controlling caselaw and is not disputed by Patton.  *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 695 (7th Cir. 2007) (stating the Eleventh Amendment generally bars claims against states, state agencies, and state employees acting in their official capacities).  Section 1983 does not disturb the states' Eleventh Amendment immunity. Section 1983 only permits claims against "persons," but states and state agencies are not "persons" under Section 1983. *Will v. Mich. Dep't of Sate Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.").

The Seventh Circuit has held that the Indiana University Board of Trustees is a state agency.  *See Peirick*, 510 F.3d at 695.  Because the IUPD is created and controlled by that Board, it too is a state agency.  *See* Ind. Code § 21-29-4-2 ("The board of trustees of a state educational institution may: (1) appoint police officers for the state educational institution for which the board is responsible."); Ind. Code § 21-39-4-4 ("A police officer serves at the pleasure of the appointing board of trustees."); *see also Mutter v. Rodriguez*, 700 F. App'x 528, 530 (7th Cir. 2017) (finding that University of Illinois at Chicago and its university police department were state agencies for purposes of sovereign immunity).

County prosecutors' offices are also state agencies. *See, e.g.*, *Hendricks v. New Albany Police Dep't*, No. 08-cv-180 (S.D. Ind. Oct. 13, 2010); *Study v. United States*, 782 F. Supp. 1293, 1297 (S.D. Ind. 1991) (holding deputy prosecuting attorneys in Indiana county were in "state office" positions, which had absolute immunity, even if they acted "maliciously, wantonly or

negligently"); *see also Omegbu v. Milwaukee Cnty.*, 326 F. App'x 940, 942 (7th Cir. 2009) (holding county district attorney's office cannot be sued under Section 1983).   The doctrine of sovereign immunity precludes Patton's Section 1983 claims against IU, the IUPD, and the Prosecutor's Office. Patton's Section 1983 claims are **dismissed** as to those defendants.

### b.   Sovereign Immunity as to Reesor, Schmuhl, Thompson, and Kehr in their Official Capacities

The Defendants also argue Reesor,[4] Schmuhl, Thompson, and Kehr, in their official capacities, are entitled to sovereign immunity as employees of state agencies.   The Eleventh Amendment generally immunizes employees of state agencies from liability.   *See Peirick*, 510 F.3d at 695.   However, the Supreme Court created a limited exception to this immunity in *Ex parte Young*, 209 U.S. 123 (1908).   Under *Ex parte Young*, a plaintiff may file suit against state officials for prospective injunctive relief to remedy ongoing violations of federal law.   *Id.* at 159–60. "[A] suit for prospective injunctive relief is not deemed a suit against the state and thus not barred by the Eleventh Amendment." *Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir. 1987) (reversing dismissal of student's discrimination claim seeking readmission to doctoral program).

Patton has sufficiently alleged ongoing violations of federal law by IU and the IUPD.   He alleges that IU has conditioned his future petitions for readmission in violation of the ADA and Rehabilitation Act, that IU has noted the denial of his readmission in his disciplinary records, and that IU and the IUPD had Patton arrested and charged with intimidation, which is also noted in Patton's disciplinary records.   *Doe v. Purdue Univ.*, No. 18-CV-89, 2019 WL 1369348, at *2 (N.D. Ind. Mar. 25, 2019) ("[O]ngoing harm can trigger *Ex Parte Young* even if a defendant is no longer

---

[4] Patton does not expressly name Reesor in her official capacity (Filing No. 91-1 at ¶ 6).   However, the IU Defendants do not argue that Patton has failed to assert a claim against Reesor in her official capacity.   Rather, they argue Patton has asserted claims against Reesor *only* in her official capacity.   The Court will therefore read Patton's Fourth Amended Complaint as suing Reesor at least in her official capacity.

taking affirmative steps that allegedly violate the law.").  Patton accordingly seeks, in part, a waiver of his readmission conditions and the expungement of his student disciplinary records related to the alleged intimidation (Filing No. 91-1 at ¶ 200).

Courts have regularly held these types of requests are appropriate remedies under *Ex Parte Young*. *See Doe v. Cummins*, 662 F. App'x 437, 444 (7th Cir. 2016) ("Appellants are requesting an injunction . . . 'prohibiting the imposition of, or reporting of, any disciplinary actions under the UC Code of Student Conduct. . . . This is nothing more than prospective remedial action."); *Doe*, 2019 WL 1369348, at *2 ("Plaintiffs seek 'reinstatement to Purdue University with all attendance benefits and . . . removal of the discipline from their records.' . . . The Court agrees with Plaintiffs that their claims . . . are cognizable under *Ex Parte Young*."); *Bissessur v. Ind. Univ. Bd. of Trs.*, No. No. 07-CV-1290, 2008 WL 4274451, at *2 (S.D. Ind. Sept. 10, 2008) ("[I]t is easy to see in this case that Plaintiff's requested reinstatement and other related future injunctive relief constitute permissible remedies under *Young*,"); *see also Mulligan v. Ind. Univ. Bd. of Trs.*, No. 19-cv-01834, 2021 WL 1225929, at *4 (S.D. Ind. Mar. 31, 2021) ("The Seventh Circuit has held that the 'goal of reinstatement and the removal of damaging information from the plaintiffs work record is not compensatory . . . rather, it is to compel the state official to cease her actions in violation of federal law and to comply with constitutional requirements.'" (omission in original) (quoting *Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986))).

However, to the extent Patton seeks the expungement of records related to the bomb threat incident, his arrest and prosecution for terroristic mischief, or his original suspension, he is not entitled to such relief.  Patton's Fourth Amended Complaint does not challenge the lawfulness of those actions or allege they resulted in an ongoing violation of his federal rights.

Patton also requests a long list of other types of injunctive relief, including revisions to University policies, racial bias training, a public apology, increased diversity and inclusion resources and efforts, the renaming of campus monuments, the replacement of a campus mural, a ban on certain guest speakers, resignations, and disciplinary and criminal actions against Defendants.  (Filing No. 91-1 at ¶ 200.)  These remaining claims for injunctive relief are not cognizable under *Ex Parte Young*.  Patton has not explained how many of these requests relate to the alleged ongoing violation of his federal rights, and he does not show that any of these requests would remedy ongoing violations instead of merely punishing Defendants. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 105–06 (1983) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if it is unaccompanied by any continuing, present adverse effects.").

Further, because Patton's recoverable injunctive relief relates exclusively to the University, it is clear that Patton has no viable claims against Kehr, who is entirely unaffiliated with the University, under *Ex parte Young*.[5]  Kehr, in his official capacity, is therefore entitled to sovereign immunity as to all of Patton's Section 1983 claims.

Patton's Section 1983 claims against Kehr in his official capacity are **dismissed**. His Section 1983 claims for compensatory and punitive damages against Reesor, Schmuhl, and Thompson in their official capacities are likewise **dismissed**.  Patton's claims against Reesor, Schmuhl, and Thompson in their official capacities for readmission to the University and the

---

[5] Patton alleges that the three remaining individual defendants are affiliated with the University, and the Court does not have enough information at the pleadings stage to determine whether Patton's injunctive relief could be obtained against any or all of them. The Court also notes that although Thompson contends he is an employee of the Prosecutor's Office, the Court must accept as true Patton's allegations regarding Thompson's employment with the IUPD.

expungement of his student disciplinary records related to the denial of his petition for readmission and alleged intimidation **shall proceed**.

### c. Sovereign Immunity as to Reesor and Schmuhl[6] in their Individual Capacities

Patton has also asserted his Section 1983 claims against Reesor and Schmuhl in their individual capacities. "On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (emphasis in original). The IU Defendants do not challenge the allegations that Reesor and Schmuhl acted under color of state law or that their actions caused the alleged deprivation of Patton's federal rights. Rather, they argue that IU and the IUPD are the real parties to Patton's claims, not Reesor and Schmuhl.

The IU Defendants state "[i]t is unclear whether Patton meant to bring individual-capacity claims against Reesor and Schmuhl" because he did not "explicitly incorporate" allegations regarding their capacities in the counts of his Fourth Amended Complaint. (Filing No. 103 at 11.) The Court disagrees. Patton expressly alleges in the introductory "Parties" section of his Fourth Amended Complaint that he is suing Reesor and Schmuhl in their individual capacities. (Filing No. 91-1 at ¶¶ 6, 8–9.) Patton's request for compensatory and punitive damages, which cannot be obtained from state officials in their official capacities, also indicates he intended to assert individual-capacity claims. (Filing No. 114 at 2.) *Reinebold v. Ind. Univ. at South Bend*, No. 18-CV-525, 2019 WL 1897288, at *3 (N.D. Ind. Apr. 25, 2019) ("Courts have allowed individual capacity claims to proceed where a plaintiff seeks both punitive and compensatory damages,

---

[6] Thompson does not argue he is entitled to sovereign immunity in his individual capacity or incorporate the IU Defendants' arguments on this issue except with respect to Count I, so he has waived that argument with respect to Counts V–VII and XI. Kehr incorporates by reference the IU Defendants' arguments, but Kehr's individual liability is more concisely addressed on the grounds of prosecutorial immunity, which the Court will discuss next.

because punitive damages 'may be available from the Defendants sued in their individual capacities *but not from the state . . . .'" (emphasis in original) (quoting *Doe*, 2019 WL 1369348, at *3)).

However, the IU Defendants correctly note that "even when a suit is against a public officer in his or her individual capacity, the court is obliged to consider whether it may really and substantially be against the state." *Luder v. Endicott*, 253 F.3d 1020, 1023 (7th Cir. 2001). Individual capacity suits are generally not barred by the Eleventh Amendment because they seek damages from individuals rather than the state treasury. *Id.* at 1022–23. Accordingly, "'a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interference with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.'" *Id.* at 1023 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984)). "Indirect effects are not enough; otherwise the practical necessity for a state to compensate an employee for bearing individual liability risk would place individual-capacity suits under the bar of the Eleventh Amendment." *Id.* Only a suit "nominally against state employees in their individual capacities that *demonstrably* has the *identical* effect as a suit against the state is . . . barred." *Id.* (emphasis in original).

The IU Defendants argue Patton's claims are, in substance, against IU and the IUPD, for two reasons. First, they argue Patton's demand of one hundred twenty million dollars plainly exceeds Reesor and Schmuhl's ability to pay and would need to be paid by their employers. Second, the IU Defendants argue Patton alleges Reesor and Schmuhl's actions were taken pursuant to a "pattern" and "official" policy of retaliation.

In arguing that Reesor and Schmuhl's inability to pay Patton's damages demand, the IU Defendants rely on *Luder v. Endicott*. 253 F.3d 1020 (7th Cir. 2001). The plaintiffs in *Luder*, like Patton, sought an immense sum of compensatory damages. According to the IU Defendants, *Luder*

held that if a state official is obviously unable to pay a damages award, then the award will necessarily flow from the state treasury, and the suit becomes "identical to a suit against the state" (Filing No. 103 at 7 (citing *Luder*, 253 F.3d at 1024)).  The IU Defendants read *Luder* too broadly. As Patton notes in his response, a state employee's inability to pay a judgment without indemnification, and the state's decision to indemnify an individual defendant, are both "irrelevant" in determining whether a plaintiff has asserted a *bona fide* individual-capacity claim. (Filing No. 114 at 3); *Luder*, 253 F.3d at 1023; *see Isabell v. Trs. of Ind. Univ.*, 432 F. Supp. 3d 786, 795 (N.D. Ind. 2020) ("To presume blindly that every suit against an individual state official cannot be paid by that individual and necessarily calls into question the public treasury would collapse this circuit's distinction under the Eleventh Amendment.").

The *Luder* court came to the "inescapable" conclusion that the state would be responsible for the judgment not solely because of the amount of damages, but also because of the nature of the damages. In *Luder*, a class of prisoners brought suit under the Fair Labor Standards Act, 28 U.S.C. §§ 201 *et seq.* ("FLSA"), arguing defendants had misinterpreted FLSA provisions and underpaid the plaintiffs. The plaintiffs sued several prison officials in their personal capacities. 253 F.3d at 1021–22.  The Seventh Circuit reasoned that if a judgment were entered against the individual defendants, they would be unable to pay and would have only two options: declare bankruptcy and quit; or declare bankruptcy and "comply with the FLSA as interpreted by the court by directing payment of additional wages." *Id.* at 1024.  If the defendants chose compliance, then the state—not the defendants—would pay the plaintiffs' additional wages. "These defendants [were] not going to pay a chunk of the prison's wages out of their own shallow pockets." *Id*.  But if the state refused to pay those additional wages, then the plaintiffs would refile suit against the same defendants, forcing them to quit "lest they be faced with another crushing judgment."  The

state would, in turn, need to replace them with two new individuals, who would simply become the next litigation targets. *Id.* at 1024. In either scenario, the plaintiffs would "accomplish *exactly* what they would accomplish were they allowed to maintain this suit against the state and did so successfully: they [would] force the state to accede to their view of the Act and to pay them accordingly." *Id.* at 1024. The Seventh Circuit has similarly held that suits arising from the plaintiff's employment relationships with the state will inevitably result in the state paying a judgment because there is "no reason" to believe an individual defendant would "foot the bill" for a judgment based on an employment contract to which only the state was a party. *Haynes v. Ind. Univ.*, 902 F.3d 724, 732 (7th Cir. 2018); *see Wade v. Ind. Univ. Sch. of Med.*, No. 16-CV-02256, 2019 WL 3067519, at *8 (S.D. Ind. July 12, 2019) ("When the plaintiff seeks damages against individual defendants arising from an employment relationship, . . . any damages would be paid by the state employer.").

Here, in contrast, Patton's individual-capacity claims against Reesor and Schmuhl seek damages to remedy violations of Patton's constitutional and statutory rights. The IU Defendants do not point to any allegations, statutes, contract, or other information that might support an inference that the state, rather than the individual defendants, would inescapably be forced to pay a judgment in this case. *Reinebold*, 2019 WL 1897288, at *2 ("The Seventh Circuit has acknowledged that applying *Luder* 'can be a knotty and fact-bound inquiry[.] Given the early stage of litigation then, it comes as no surprise that nothing indicates that a judgment in [plaintiff's] flavor would 'flow from the state treasury' instead of [the individual defendants]." (alteration in original) (citation omitted) (quoting *Haynes*, 902 F.3d at 732) (denying motion to dismiss individual employees of Indiana University at South Bend for alleged discriminatory hiring)); *see Calautti v. Shanahan*, No. 18-cv-119, 2019 WL 3717980, at *2 (S.D. Ind. Aug. 7, 2019)

(concluding former academic appointee with Indiana University Media School sufficiently alleged individual-capacity claims by requesting compensatory and punitive damages unrelated to employment contract, despite also seeking damages under employment contract that "unquestionably" would be paid by University).

The IU Defendants next argue that because Patton alleges Reesor's and Schmuhl's conduct was "part of an 'Official Policy'" of retaliation, they are not the "real parties" (Filing No. 91-1 at ¶ 131; Filing No. 103 at 12).  However, the Court does not conclude there is no set of facts under which the individual defendants would remain the "real parties".  *See Doe*, 2019 WL 1369348, at *3 (denying motion to dismiss individual-capacity claims against university officials) ("Defendants argue . . . the allegations in the relevant Counts 'are directed to their implementation of a [Purdue] policy, not any unauthorized conduct.' Defendants provide no support for the contention that the 'implementation' of a policy cannot form the basis for individual liability."). Patton's allegations sufficiently allege that Reesor's and Schmuhl's conduct caused the deprivation of his federal rights.  Patton's references to an "official policy" do not make Reesor's and Schmuhl's roles so nominal that they cease to be real parties in interest.  In other words, Patton has not pled his individual-capacity claims out of court by alleging a "pattern" and "official policy."

At this stage, Patton may assert claims against Reesor and Schmuhl in both their official and individual capacities.  *Miller v. City of Plymouth*, No. 09-CV-205, 2010 WL 1474205, at *8 (N.D. Ind. Apr. 9, 2010) ("[W]hile Plaintiffs cannot, at the end of the day, recover on inconsistent claims, Plaintiffs may plead inconsistent claims, and such claims can be submitted to the jury to be sorted out"); *see Isabell*, 432 F. Supp. 3d at 794 ("The complaint alternatively pleaded both capacities.").  Patton's Section 1983 claims against Reesor, Schmuhl, and Thompson in their individual capacities **shall proceed**.

### d.  **Prosecutorial Immunity as to the State Defendants**

The State Defendants also seek prosecutorial immunity as to all of Patton's claims. Prosecutors acting within the scope of their employment and prosecutorial duties are entitled to absolute immunity for conduct "intimately associated with the judicial phase of the criminal process." *Katz-Crank v. Haskett*, No. No. 13-cv-00159, 2014 WL 1324283, at *6 (S.D. Ind. Mar. 31, 2014). *Smith v. Power*, 346 F.3d 740, 742 (7th Cir. 2003) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976))). "[A]bsolute immunity shields prosecutors even if they act 'maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence.'" *Id.* (quoting *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986)).

All of Patton's allegations against the State Defendants stem exclusively from Kehr's signing and filing the criminal information.  Preparing and filing of a criminal information is "intimately associated with the judicial phase of the criminal process" and qualifies Kehr for absolute prosecutorial immunity from all of Patton's claims. *See Kalina v. Fletcher*, 522 U.S. 118, 118 (1997) ("[T]he preparation and filing of . . . the information and the motion for an arrest warrant . . . are protected by absolute immunity); *Katz-Crank*, 2014 WL 1324283, at *6 (citations omitted) (finding plaintiff's claims regarding her prosecution without probable cause all "involve 'initiating a prosecution and presenting the state's case,' for which state prosecutors are absolutely immune from suit." (quoting *Burns v. Reed*, 500 U.S. 478 (1991))).

However, prosecutorial immunity is a personal defense that may be raised only by Kehr in his individual capacity. *Weatherspoon v. Khoury*, No. 20-cv-2077, 2021 WL 2401970, at *2 (S.D. Ind. June 11, 2021) ("In an 'official-capacity action, [personal] defenses are unavailable. The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment.'" (alteration and emphasis

in original) (citations omitted) (quoting *Graham*, 473 U.S. at 167)). The Court therefore **dismisses** all claims (Counts I–XVI) against Kehr in his individual capacity.

### e.  Qualified Immunity as to Thompson

Thompson argues he is entitled to qualified immunity against Patton's Section 1983 claims because he had "arguable" probable cause for Patton's arrest.  As Thompson correctly notes, the Supreme Court has emphasized that a court should resolve qualified immunity questions "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). However, "[b]ecause a qualified immunity defense so closely depends 'on the facts of the case,' a 'complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds.'" *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (quoting *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001)) (reversing and remanding denial of Section 1983 claim on qualified immunity grounds under Rule 12(b)(6)); *see Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020) (stating that Rule 12(b)(6) is not "always (if ever) the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim") (citing *Alvarado*, 267 F.3d at 651–52); *see Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000) ("[T]he plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity.").

To avoid placing undue burdens on plaintiffs at the pleadings stage, the Seventh Circuit has "reiterate[d] that 'a complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred.' And the familiar plausibility standard governs." *Hanson*, 967 F.3d at 590 (citation omitted) (quoting *Jacobs*, 215 F.3d at 756 n.3). Here, Patton has alleged violations of his well-established right to free speech without retaliation under the First Amendment, and his right not to be arrested without probable cause. *See*

*Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020) ("[T]he First Amendment protects against retaliation . . . ."); *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435 (7th Cir. 1993) ("[N]o one disputes that the constitutional right not to be arrested without probable cause is well established . . . ."). At this stage, the Court is unable find that Thompson is entitled to qualified immunity.[7]

### 2.   **Existence of Probable Cause**

The Defendants argue Patton's Section 1983 claims should also be dismissed because there was probable cause to arrest Patton for intimidation.  Probable cause generally bars claims for First Amendment retaliatory arrest and prosecution, and absolutely bars claims of Fourth Amendment false arrest.  *Nieves v. Bartless*, 139 S. Ct. 1715, 1726 (2019); *Muhammad v. Pearson*, 900 F.3d 898, 907–08 (7th Cir. 2018) (citations omitted).  *But see Nieves*, 139 S. Ct. at 1727 (creating limited exception to rule that probable cause bars First Amendment retaliation claims); *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018) (same).

Defendants ask the Court to take judicial notice of the public court records from Patton's intimidation prosecution, which the Court may and will do.  *See Ennenga v. Starns*, 677 F.3d 766 (7th Cir. 2012) (affirming district court taking judicial notice of facts in court records from earlier state court litigation).  Included in the court records is a Probable Cause Order issued by the Monroe Circuit Court, in which the judge found probable cause for Patton's arrest (Filing No. 103-2).  Defendants argue this judicial determination of probable cause establishes *prima facie* evidence of probable cause for Patton's arrest.

---

[7] Although the Court is unable to address the issue of qualified immunity at this stage, the Court and the parties have "a variety of means at [their] disposal to move the case incrementally forward" until the Court can address the issue. *Jacobs*, 215 F.3d at 765 n.3; *see Hanson*, 967 F.3d at 590, n.2 (citing Rules 12(e) and 26(c) as rules "that can be engaged to avoid or curtail discovery before a qualified-immunity decision is made on summary judgment.").

Indiana courts have held that a judicial determination of probable cause in a criminal action constitutes *prima facie* evidence of probable cause in later civil litigation.[8] *Glass v. Trump Ind., Inc.*, 802 N.E.2d 461, 467 (Ind. Ct. App. 2004). However, a plaintiff may rebut *prima facie* evidence of probable cause by showing that the probable cause finding "was induced by false testimony, fraud, or other improper means such as the defendant withholding material facts at the hearing." *Id.*; *see Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir. 2010). Patton alleges Defendants omitted material information from the probable cause affidavit and charging information. *See McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009) (stating that although an officer has no duty to continue an investigation once he has uncovered grounds for probable cause, he "may not close his eyes to facts that would clarify the situation"); *Owens v. Downey*, No. 15-cv-776, 2017 WL 4868197, at *9 (S.D. Ind. May 26, 2017) (quoting *Glass*, 802 N.E.2d at 467) (denying summary judgment on Section 1983 malicious prosecution claim because genuine disputes of material fact existed regarding whether arresting sheriff had knowledge of material facts that were omitted from a probable cause affidavit, despite a judicial finding of probable cause).

Specifically, Patton alleges Schmuhl and Thompson omitted material information regarding the "context" of his emails. "The materiality of an omitted or misrepresented fact depends on its relative importance to the evaluation of probable cause; an omitted fact is material if its inclusion would have negated probable cause." *Whitlock*, 596 F.3d at 411; *see Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016) ("The key question here is whether the omitted details were indeed material to the probable-cause determination, a question we approach by asking

---

[8] Patton cites *Bailey v. Andrews*, 811 F.2d 366 (7th Cir. 1987), in arguing "[i]t is impossible for the Defendants to have prima facie probable cause" because the parties did not fully litigate the issue of probable cause at the probable cause hearing in his criminal case. *Bailey* holds only that a defendant may dispute a finding of probable cause in later litigation, which Patton is doing in this case. However, a judge's probable cause determination is nevertheless *prima facie* evidence of probable cause. *Prima facie* evidence is not conclusive, but it creates a legal presumption of probable cause, which Patton must rebut with his own evidence.

'whether a hypothetical affidavit that included the omitted material would still establish probable cause'" (quoting *Whitlock*, 596 F.3d at 411)); *Owens*, 2017 WL 4868197, at *9 (denying summary judgment to defendant, finding a reasonable jury could conclude sheriff omitted material information from probable cause affidavit).

To determine whether Patton has adequately alleged the omission of "material" information from the probable cause affidavit and charging information, the Court must look at the crime for which Patton was arrested and charged.   Indiana Code § 35-45-2-1 makes it unlawful to "communicate[] a threat with the intent . . . that another person be placed in fear of retaliation for a prior lawful act."  Ind. Code § 35-45-2-1(a).  As used in the statute, a "threat" is "an expression, by words or actions, of an intention to: . . . unlawfully injure the person threatened."  Ind. Code § 35-45-2-1(c)(1).   The Indiana Supreme Court has explained that the statute's prohibition on "threats" is limited to "true threats".  *Brewington v. State*, 7 N.E.3d 946, 963 (Ind. 2014).  "'[T]rue threats' under Indiana law depend on two necessary elements: that the speaker intended his communications to put his targets in fear for their safety, and that the communications were likely to actually cause such fear in a reasonable person similarly situated to the target."  *Brewington*, 7 N.E.3d at 964. Both of these elements are determined using an objective test.  *McBride v. State*, 128 N.E.3d 531, 537 (Ind. Ct. App. 2019).

For all specific-intent crimes, "the need for probable cause on the intent element is particularly acute".  *Dollard v. Whisenand*, 946 F.3d 342, 360 (7th Cir. 2019) (quoting *Jordan*, 487 F.3d at 1355–56).  For crimes like intimidation, probable cause of intent is crucially important because "[t]he speaker's intent . . . is often the deciding factor between whether a communication is 'constitutionally proscribable intimidation' or protected 'core political speech.'"  *Brewington*, 7 N.E.3d at 963 (quoting *Virginia v. Black*, 538 U.S. 343, 365 (2003)).  Patton argues he did not

intend to intimidate Reesor with his emails, and that "any reasonable reader would know" Patton intended only to mock (*i.e.*, "troll") the University and IUPD by sending hyperbolic and inflammatory messages.  He argues the omitted context of his email make that intent clear.

The Court must decide whether Patton has plausibly alleged that Schmuhl and Thompson omitted exculpatory, contextual information that would have negated probable cause.  "Adding exculpatory information to a hypothetical affidavit permits us to determine whether the officer distorted the magistrate's judgment by suppressing material evidence.  An affidavit that misleads or lies by omission undercuts the magistrate's ability to make an independent probable cause determination."[9] *Rainsberger*, 913 F.3d at 651–52 (citations omitted) (quoting *Franks v. Delaware*, 438 U.S. 154, 165 (1978)).

Patton alleges the probable cause affidavit included the following summarized information about only five communications between Patton and Reesor: (1) Patton's March 12, 2018 petition for readmission; (2) Reesor's March 26, 2018 denial of Patton's application; (3) Patton's March 26, 2018 response to the denial, which claimed Reesor's decision was discriminatory and stated Patton was forwarding his email to the Office of Financial Student Aid; (4) Patton's May 25, 2018 email stating "I'm ready for this bullsh*t to be over with," accusing Reesor of racism, and stating Reesor will "regret" her decision; and (5) Patton's June 1, 2018 email with the subject line "I thought about killing you," referring to a Kanye West song (Filing No. 91-1 at ¶¶ 151–154). The charging information did not include any additional information, simply stating that "on or about October

---

[9] The IU Defendants urge the Court to consider all of Patton's emails in determining whether probable cause existed (Filing No. 125 at 3). However, the Court cannot assume that Schmuhl, Thompson, Kehr, or the Monroe Circuit Court judge had knowledge of all of Patton's emails.  And further, the Court may only include exculpatory statements in its "hypothetical affidavit." *Rainsberger v. Benner*, 913 F.3d 640, 651 (7th Cir. 2019) ("It bears emphasis that there is no lack of symmetry between our willingness to go beyond the affidavit to consider evidence of innocence while staying strictly within it for evidence of guilt.  Both rules are designed to protect the integrity of the warrant process.").

26, 2017," Patton communicated a threat to kill Reesor with the intent of placing her in fear of retaliation for her denial of Patton's petition for readmission (Filing No. 127-1).

Neither the probable cause affidavit nor the charging information mentions Patton's ongoing pending civil rights complaint against IU, the dozens of other politically-charged, yet non-threatening emails Patton sent to Reesor between March 26 and May 25, 2018, or the exculpatory statements in Patton's May 25, 2018 email and later emails regarding his "trolling". All of this contextual, exculpatory information, combined, could negate a finding of probable cause otherwise based on only certain portions of Patton's May 25 and June 1, 2018 emails.

Specifically, the probable cause affidavit and charging information allegedly did not refer to Patton's May 25, 2018 statement that:

> *Ranting, trolling, and the super hoax* (the hoax might be a threat to national security at this point [crying laughing emoji]) *are very good ways at relieving the trauma* your officers caused me and the trauma [Reesor] (is the type of racist that will take pictures [] with black people to say they aren't racists) is trying to cause me*. I will stop sending the emails once my complaint is resolved. Those are all benign manifestations of my "disability."*

(Filing No. 91-1 at 138 (emphasis added)).

The documents also omit Patton's reference to his OCR complaint before stating that Reesor would "regret" her decision to deny Patton's petition for readmission:

> *I had the dept of ed cc'd for a reason. I know she can't keep me suspended*. IDK why she hates me other than racism but I have been nothing but honest and truthful. Some people out there just want to see you fail I guess. She tried to screw me over but I predicted that. F*ck her too. She will regret that decision in the future. Sorry I am so blunt but people with ptsd [sic] aren't politically correct.

*Id.* at 139 (emphasis added).

Patton's June 2, 2018 emails are also omitted from the probable cause affidavit and charging information, yet they contain lengthy, exculpatory statements regarding Patton's intent.

(Filing No. 91-1 at 156–61.)

Patton has therefore plausibly alleged the omission of material information regarding his intent from the probable cause affidavit and/or the charging information.  To be clear, the Court is *not* holding that there was no probable cause to arrest Patton for intimidation.  Instead, the Court cannot make a probable cause determination without knowing what was, in fact, contained in the probable cause affidavit, and what Schmuhl and Thompson knew at the time they sought the arrest warrant. *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) (stating probable cause is determined based on "what the officer knew at the time he sought the warrant, not at how things turned out in hindsight"); *see Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008) (stating courts must "step[] into the shoes of a reasonable person in the position of the officer" considering facts known to that officer at the time).  The Court is merely holding that Patton has sufficiently alleged the absence of probable cause for purposes of surviving dismissal under Rule 12(b)(6). His claims against Reesor, Schmuhl, and Thompson may therefore **proceed**.

### 3.      Unprotected Speech

The IU Defendants also argue that Patton's First Amendment claims should be dismissed because his speech constitutes an unprotected "true threat".  (Filing No. 103 at 15.)  *Black*, 538 U.S. at 358–59.  Whether Patton's speech is a "true threat," however, is an issue of fact for a jury. *United States v. Saunders*, 166 F.3d 907, 913 (7th Cir. 1999) ("Whether the statement constitutes a threat was an issue of fact for the jury to decide."); *see United States v. Parr*, 545 F.3d 491, 497 (7th Cir. 2008) ("We think it readily apparent that Parr's statements were threats, but ultimately that question was for the jury.").  The Court cannot dismiss Patton's claims under Rule 12(b)(6) on the grounds that his speech constituted a "true threat".

### 4.      Failure to Sufficiently Plead Elements of Section 1983 Claims

The IU Defendants (and other Defendants by reference) identify several particularized deficiencies in Patton's claims.  Defendants first argue Patton has not sufficiently alleged a causal

connection between Defendants' alleged discriminatory or retaliatory animus and Patton's injuries. As to Count I, Defendants contend Patton has not identified a "deprivation" that would deter First Amendment activity. As to Count XI, Defendants argue Patton has not sufficiently alleged a denial of his civil rights. And as to Counts XIII and IX, they argue Patton cannot assert civil causes of action for perjury or subornation of perjury. The Court will address each deficiency in turn.

> **a.     Lack of Causal Connection Between Animus and Injury**

Defendants argue that Patton cannot show a causal connection between their alleged discriminatory and retaliatory animus and Patton's injuries because Patton has pleaded an "obvious alternative explanations" for Defendants' conduct. Defendants claim the denial of Patton's petition for readmission is explained by his continued status as a treat to himself or others, and that his arrest and prosecution is explained by his inflammatory emails to Reesor.

In determining whether a complaint is "plausible on its face," "a court may consider whether there are 'obvious alternative explanation[s]' to the one alleged in the complaint, but the court is not to weigh the defendant's and plaintiff's stories to determine which one is 'more plausible.' That level of scrutiny is inappropriate even at the summary judgment stage." *Riley v. Vilsack*, 665 F. Supp. 2d 994, 1006 (W.D. Wis. Oct. 21, 2009) (quoting *Twombly*, 550 U.S. at 566–67, 570)).

The "obvious alternative explanation" argument originated from *Twombly*, 550 U.S. at 567, and *Iqbal*, 556 U.S. at 682. As this Court has explained, those cases involved uniquely obvious alternative explanations:

> While *Twombly* is an apt illustration of the type of case in which sparse factual support can be fatal to a plaintiff on a motion to dismiss, Defendants' citation fails to appreciate the differences in context which sharply distinguish cases like *Twombly* and *Iqbal* from the one before us. *Twombly* involved an allegation of illegal collusion among telecommunications companies, supported only by the defendants' parallel conduct; the 'obvious alternative explanation' was that the companies' pricing was parallel as a result of normal business incentives rather than

a secret conspiracy. In *Iqbal*, the plaintiffs alleged that the U.S. Government's antiterrorism detention policies unconstitutionally discriminated on the basis of race and nationality; the Court found that plaintiffs had shown no facts discrediting the hypothesis that the arrests were 'lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts.'

*Heckler & Koch, Inc. v. Herman Sport Guns GmbH*, No. 11-cv-1108, 20143 WL 12291720, at *5 (S.D. Ind. Sept. 27, 2013) (citations omitted).

The "obvious alternative explanation" argument is unsuccessful here for two reasons. First, Patton, has not alleged "so fantastic a story that it could be easily debunked by a non-illicit 'obvious alternative explanation.'" *Popovich v. Weingarten*, 779 F. Supp. 2d 891, 900–01 (N.D. Ind. 2011) (citations omitted). He claims that in March of 2016, IU and the IUPD subjected him to an excessive arrest, disproportionately severe criminal charges, and academic suspension on the basis of his race. In October 2017, Patton became vocal about his perceived mistreatment and started sending emails to Reesor criticizing IU and the IUPD. He even went so far as to send emails to the DOE alleging that the IUPD had violated the Clery Act. In early March 2018, Patton notified IU that the DOE was opening an investigation into the IUPD's alleged violations of the Clery Act. Patton submitted his petition for readmission shortly thereafter, on March 16, 2018. On March 24, 2018, while his application remained pending, Patton sent yet another email to Reesor regarding his Clery Act complaint. Two days later, Reesor denied Patton's application.

After the denial of his application, Patton proceeded to file another complaint with the DOE and sent several more emails to Reesor and to Oestreich regarding racial and disability discrimination. Patton continued sending these emails until June 2, 2018, when he sent two final emails to Reesor and Oestreich explaining that he had not intended to threaten Reesor, that he was attempting to bring awareness to mental health issues, and that he intended to continue venting his frustrations through pursuit of his DOE complaint. Several days later, Patton was arrested and

charged with felony intimidation. These allegations present a story of discrimination and retaliation that "holds together" for purposes of surviving dismissal under Rule 12(b)(6).

Second, the alleged non-illicit explanations for IU and the IUPD's actions are not so patently obvious as to make Patton's causation allegations implausible.  The IU Defendants argue Patton was obviously not readmitted to the University because he continued to pose a danger to himself and others.  Specifically, the IU Defendants argue that Patton failed to "take responsibility" for the bomb threat incident and failed to show he would not repeat his behavior. Taking Patton's allegations as true and drawing all inferences in his favor, the Court does not view the IU Defendants' proffered reasoning as an "obvious alternative explanation".  Reesor's March 26, 2018, letter does not state why she denied Patton's application.  It only states "I have reviewed the information related to the incidents that happened in 2016 and your petition to seek reinstatement is denied at this time but may be reconsidered as of May 2019." (Filing No. 91-1 at 81.)  Although she does request that Patton continue counseling "to address the incidents" and explain in future applications how he is "working to assure that this behavior does not happen again," it is not obvious from the text of the letter that Reesor included these requests because she considered Patton to still pose a threat.  Additionally, in his application, Patton insists that he never intended or expected that the box of books would be perceived as a threat, further cutting against the argument that he obviously continued to pose a threat to himself or others.

With respect to Patton's arrest and prosecution, the IU Defendants' proffered explanation is likewise not so obvious as to negate any plausible inference of retaliatory motivation.  The IU Defendants argue the "obvious alternative explanation" for Patton's arrest and prosecution was his threatening emails to Reesor.  But Patton did not send only threatening emails, nor was he arrested immediately after sending those emails.  Patton's arrest was preceded by a months-long email

campaign, in which Patton accused Reesor, IU, and the IUPD of racism and disability discrimination, and in which Patton reported IU and the IUPD to the DOE for violations of the Clery Act and disability discrimination.  Patton was arrested several days after he ended the email campaign with two lengthy, apologetic emails to Reesor explaining he intended to "troll" IU and that he would continue using his DOE complaint to resolve his dispute with IU.  It is plausible that after weathering months of Patton's emails, learning that Patton intended to continue pursuing his DOE complaints, and realizing that Patton would continue pursuing his complaints despite his continued suspension from the University, IU and the IUPD attempted to finally bring Patton's complaints to a halt by having him arrested and prosecuted. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 829 (7th Cir. 2014) ("[T]he district court once again seemed to require evidence at the pleading stage and . . . relied exclusively on a summary judgment case, [losing] sight of the bigger picture, which showed an ongoing pattern of retaliation . . . ."); *Tedrow v. Franklin Twp. Cmty. Sch. Corp.*, No. 21-CV-453, 2022 WL 784064, at *5 (S.D. Ind. Mar. 14, 2022) ("[Plaintiff] alleges the School Corporation placed him on an improvement plan purposely designed to punish him two weeks after he received right-to-sue letters.  This might prove insufficient at trial, but it's a plausible claim of retaliation for protected activity relating to his sex and disability.").

The Court finds *Kluge v. Brownsburg Community School Corporation* to be analogous. 432 F. Supp. 3d 823 (S.D. Ind. 2020). The plaintiff in that case, Kluge, alleged he was forced to resign from his teaching position because his sincerely held religious beliefs prevented him from adhering to the school's policy of addressing transgender students by their preferred names and pronouns.  The school initially permitted Kluge to refer to students by their last names only, but the school later withdrew the "last names only" policy after students complained about it.  *Id.* at 834.  The school moved to dismiss Kluge's claims under Rule 12(b)(6), arguing in part that Kluge

failed to establish a causal connection between his request for a religious accommodation (the "last names only policy") and his resignation.  The school argued it "defie[d] logic" that the school would permit the last-names-only arrangement, "then somehow concoct student complaints as an excuse to rescind the last-name accommodation, all because [the school] harbored discriminatory animus toward [Mr.] Kluge from the beginning."  *Id.* at 847 (internal quotation marks omitted). But the Court, taking Kluge's allegations as true, found it was "plausible that the school officials, over time, became less inclined to tolerate Mr. Kluge's religious beliefs and used the idea of student complaints as a pretext to withdraw the last-names only arrangement."  *Id.*  Here, it is plausible that IU and the IUPD became less inclined to tolerate Patton's speech and used portions of certain emails to have him arrested.

The Court takes no position on the likelihood of Patton's success on the merits of his claims and emphasizes that "[m]oving past the motion-to-dismiss stage does not guarantee victory for [Patton] any more than it does for any other plaintiff."  *Junhao Su v. E. Ill. Univ.*, 565 F. App'x 520, 522 (7th Cir. 2014).  For now, though, Patton's allegations are sufficient to survive dismissal.

### b.    Lack of Alleged Deprivation as to Count I

Defendants argue Count I should be dismissed because Patton has not sufficiently alleged all elements of First Amendment retaliation.  To allege First Amendment retaliation, a plaintiff must show "(1) they engaged in activity protected by the First Amendment; (2) they suffered a deprivation that would likely deter First Amendment activity; and (3) the First Amendment activity was at least a motivating factor in the [state official's] decision."  *Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012).  The IU Defendants focus on the second element.  They argue Patton did not suffer a "deprivation" when his petition for readmission was denied because he has no constitutional right to attend the University.  They also argue that the denial of his readmission is not likely to deter First Amendment activity.  The Court disagrees on both accounts.

First, unlike claims under the Fourteenth Amendment Due Process Clause, claims of First Amendment retaliation need not allege the deprivation of a constitutional right. "Any deprivation under color of law that is likely to deter the exercise of free speech . . . is actionable . . . if the circumstances are such as to make such a refusal an effective deterrent to the exercise of a fragile liberty." *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) (citing *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982)). The retaliatory action itself need not amount to an independent constitutional violation. *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005) ("Conduct that does not independently violate the Constitution can form the basis for a retaliation claim, if that conduct is done with an improper, retaliatory motive."); *Holleman*, 951 F.3d at 877–78 (concluding that a prisoner's transfer to a particular prison could be considered a deprivation if the transfer was retaliatory, despite "the fact that a prisoner does not have a constitutional right to a particular prison placement"). Although Patton has no constitutional right to continue his education at the University, the denial of his petition for readmission is a sufficient deprivation for purposes of First Amendment retaliation.

Second, the Court finds that the denial of readmission to a university is a deprivation that would chill First Amendment activity. The IU Defendants, without support, contend that "[t]he only activity deterred [by the denial of Patton's petition for readmission] would be faking bomb threats". (Filing No. 103 at 13.) Although Patton's initial suspension was plainly tied to the bomb threat incident, the denial of Patton's readmission—nearly a year later and after months of public complaints of discrimination—is not so clearly tied to the same incident. This deprivation would dissuade an average student (particularly one who has been suspended and may wish to be readmitted) from voicing concerns about the University. *See O'Brien v. Welty*, 818 F.3d 920, 933 (9th Cir. 2016) (finding student discipline, including restricting access to parts of campus and

limiting involvement in student groups, following faculty complaints of harassment and intimidation in violation of student conduct code would chill first amendment activity of students); *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006) (finding that suspension from extra-curricular activities would chill students' protected speech); *Bhattacharya v. Murray*, 515 F. Supp. 3d 436, 456 (W.D. Va. 2021) ("[University officials] issued a Professionalism Concern Card against [plaintiff], suspended him from UVA Medical School, required him to undergo counseling and obtain 'medical clearance' as a prerequisite for remaining enrolled, and prevented him from appealing his suspension or applying for readmission by issuing and refusing to remove the [No Trespass Order]. Because a student would be reluctant to express his views if he knew that his school would reprimand, suspend, or ban him from campus for doing so, the Court concludes that [plaintiff] has adequately alleged adverse action."). Patton has sufficiently alleged the second element of First Amendment retaliation.

### c.      Lack of Alleged Denial of Civil Rights as to Count XI

"A § 1983 conspiracy claim requires both (1) an underlying constitutional violation and (2) an agreement among the defendants to inflict the unconstitutional harm." *Green v. Howser*, 942 F.3d 772, 778 (7th Cir. 2019).   Defendants argue Patton has not alleged an underlying constitutional violation.   As the Court has already concluded, Patton has sufficiently alleged violations of the First and Fourth Amendments.

### d.      Lack of Civil Cause of Action for Perjury and Subornation of Perjury as to Counts VIII and IX

Defendants argue Patton's Counts VIII and IX for Perjury and Subornation of Perjury are not cognizable claims under Section 1983.  Defendants are correct, and Patton has conceded this point in other briefing.  (Filing No. 50 at 14.)  "The general rule . . . is that in the absence of statute, no action lies to recover damages caused by perjury or subornation of perjury." *Liddell v. Smith*,

345 F.2d 491, 494 (7th Cir. 1965); *S. Haven Sewer Works, Inc. v. Jones*, 757 N.E.2d 1041, 1047–48 (Ind. Ct. App. 2001). Accordingly, Counts VIII and IX as to all Defendants are **dismissed**.

## C.     Patton's Title VI Claims—Counts II and XII

The IU Defendants (and Thompson by reference) argue Patton's Title VI claims (Counts II and XII) should be dismissed against the individual defendants because Title VI does not provide for individual liability. They contend the Title VI claims should be dismissed as to all IU Defendants and Thompson because Patton has not alleged a sufficient causal connection between their retaliatory animus as Patton's injury, and because Patton has not alleged his exclusion from federally-funded activities. The Court will address each argument in turn.

### 1.     No Individual Liability

The IU Defendants and Thompson argue Reesor, Schmuhl, and Thompson should be dismissed from Patton's Title VI Claims because Title VI does not provide for individual liability. Although neither the United States Supreme Court nor the Seventh Circuit has addressed this issue, the IU Defendants' and Thompson's position has been adopted by other district courts within the Seventh Circuit, that have analogized Title VI claims to Title IX claims. "Title IX of the Civil Rights Act 'was modeled after Title VI of the Civil Rights Act' and . . . the 'two operate in the same manner,' which means that 'a decision with respect to one statute applies to the other statute.'" *Rogers v. Office of the Att'y Gen.*, No. 16-CV-429, 2017 WL 2864950, at *2–3 (N.D. Ind. July 5, 2017) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). A "Title IX claim can only be brought against a grant recipient and not an individual." *Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1019–20 (7th Cir. 1997) (discussing Congress's rationale for limiting private rights of action under Title IX). Patton does not allege that any of the individually named defendants are recipients of federal funds, and "the mere fact that the Defendants are employed by the government (albeit the State) does not mean that they are recipients of federal

funds." *Rogers*, 2017 WL 2864950, at *3.   Counts II and XII against Reesor, Schmuhl, and Thompson must therefore be **dismissed**.

### 2.      Insufficient Causal Connection

The IU Defendants argue Patton has not sufficiently alleged a causal connection between their discriminatory and retaliatory animus and Patton's injuries.   For the reasons as discussed with respect to Patton's Section 1983 claims, the Court disagrees and concludes he has.

### 3.      No Exclusion from Federally-Funded Activities

The IU Defendants argue that Patton's Count XII should be dismissed because Patton has not alleged his arrest and prosecution resulted in his exclusion from any federally-funded activity or program in violation of Title VI.   The IU Defendants reason that Patton could not have been excluded because he was already suspended from the University at the time.   However, Title VI also prohibits retaliation against those opposing conduct that violates Title VI. 34 C.F.R. § 100.7(e); *Reed v. Columbia St. Mary's Hosp.*, 782 F.3d 331, 337 (7th Cir. 2015) (referring to Title VI's anti-retaliation provision, citing 34 C.F.R. § 100.7(e)).   Patton alleges he was arrested and prosecuted for, in part, opposing the allegedly discriminatory denial of his application for admission. That is sufficient to allege a Title VI violation.

### D.      Patton's ADA and Rehabilitation Act Claims—Counts III–IV and XIII–XIV

The IU Defendants' arguments regarding Patton's ADA and Rehabilitation Act claims are similar to their arguments regarding Patton's Title VI claims. They contend the ADA and Rehabilitation Act do not provide for individual liability, that Patton has not sufficiently alleged causation, and that he was not excluded from participation in public activities on the basis of his disability.   The IU Defendants also argue Patton has not alleged he suffers from a "disability" under the ADA or Rehabilitation Act.

### 1.      No Individual Liability

Defendants are correct that neither the ADA nor Rehabilitation Act provides for individual liability.  *See, e.g.*, *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 544 (7th Cit. 2015) (affirming dismissal of individual defendants from claims of discrimination and retaliation under ADA and Rehabilitation Act); *Walker v. Snyder*, 213 F.3d 344, 346 (7th Cir. 2000) (explaining that there is "no personal liability under Title II" of the ADA); *Silk v. City of Chicago*, 194 F.3d 788, 797 n.5, 798 n.7 (7th Cir. 1999) (finding ADA does not provide for individual liability and explaining that ADA and Rehabilitation Act are nearly identical).  Patton's ADA and Rehabilitation Act claims against Reesor, Schmuhl, and Thompson in their individual capacities must be **dismissed**.

Patton may, however, pursue claims for injunctive relief against Reesor, Schmuhl, and Thompson in their official capacities.  Claims for injunctive relief under Title II of the ADA are cognizable under *Ex Parte Young*; *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 912–13 (7th Cir. 2003) (noting the United States Supreme Court had held that claims for injunctive relief under Title I of the ADA are cognizable under *Ex Parte Young*, and finding there is "no relevant difference between Title I and Title II . . . so far as the applicability of *Ex parte Young* is concerned") (citing *Bd. of Trs. v. Garrett*, 531 U.S. 356, 374 n.9 (2001)).  Counts III–IV against Reesor, Schmuhl, and Thompson in their official capacities, and Counts XIII–XIV against Reesor in her official capacity for injunctive relief only, **shall proceed**.

### 2.      Insufficient Causal Connection

The IU Defendants again argue that Patton's ADA and Rehabilitation Act claims should be dismissed for failure to allege a causal connection between their discriminatory or retaliatory animus and Patton's alleged injuries.  For the reasons discussed above, the Court concludes Patton has sufficiently alleged such a causal connection.  *See Kluge*, 432 F. Supp. 3d. at 847.

### 3.      No Exclusion from Participation in Public Programs

The IU Defendants next argue that Patton fails to allege his exclusion from participation in public programs on the basis of his disability.  (Filing No. 103 at 24.)  But like Title VI, the ADA and Rehabilitation Act also prohibit retaliation against those opposing disability discrimination. 42 U.S.C. § 12203(b); 29 U.S.C. § 794.  Patton's allegations that he was arrested and prosecuted for speaking out against his alleged disability discrimination are sufficient to assert claims under the ADA and Rehabilitation Act.

### 4.      <u>Failure to Allege Disability</u>

The IU Defendants contend Patton's ADA and Rehabilitation Act claims also fail because Patton has not sufficiently alleged he has a "disability".  The IU Defendants argue that although Patton alleges he previously suffered from a mental disability (PTSD), Patten had recovered from that disability by the time his petition for readmission was denied.  In response, Patton argues he sufficiently alleged the existence of a qualifying disability (PTSD) and that IU regarded him as being disabled.  (Filing No. 91-1 at ¶ 116.)

Patton's own allegations show that he had recovered from his PTSD and other related mental disabilities by the time he petitioned for readmission.  (Filing No. 91-1 at 28.)  However, Patton has sufficiently alleged that IU regarded him as being disabled.  (Filing No. 114 at 34.) "Disability" under the ADA is defined to include "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment."  42 U.S.C. § 12102(1).  An individual is "regarded as having such an impairment," if that individual "establishes that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  *Id.* § (3)(A).

Patton specifically argues that by conditioning his future applications for readmission on continued counseling and a psycho-social assessment, IU evidently regarded Patton as suffering from some type of mental or psychological disability. The IU Defendants reply to Patton's "regarded as" argument by noting that "disability related inquiries" are governed by only Title I of the ADA, not Title II (Filing No. 125 at 12).  But regardless of whether the readmission conditions constituted a "disability related inquiry," they are enough to allow the Court to draw a reasonable inference that IU regarded Patton as suffering from some type of disability.  Patton has therefore sufficiently alleged that he had a "disability" under the ADA and Rehabilitation Act.

**E.**     **Patton's Tort Claims—Count X (Abuse of Process), Count XV (Malicious Prosecution), and Count XVI (Defamation)**

Defendants argue they are shielded from liability for Patton's state law tort claims under the Indiana Tort Claims Act ("ITCA"). Thompson further argues that Patton's malicious prosecution claim, to the extent it is brought under federal law, is insufficiently pled.

1.     **State Law Tort Claims**

Under the ITCA, governmental entities and their employees acting within the scope of their employment are shielded from tort liability if the alleged loss results from "[t]he initiation of a judicial or an administrative proceeding."  Ind. Code § 34-13-3-3(a)(6); *see F.D. v. Ind. Dep't of Child Servs.*, 1 N.E.3d 131, 137 (Ind. 2013).  The ITCA's protections apply to claims for money damages as well as claims for injunctive relief.  *Holtz v. Bd. of Comm'rs*, 560 N.E.2d 645, 647–48 (Ind. 1990) (holding that ITCA applies to all torts); *see Stillwater of Crown Point Homeowner's Ass'n, Inc. v. Kovich*, 865 F. Supp. 2d 922, 933 (2011) (rejecting arguing that ITCA did not provide immunity to tort claims seeking injunctive relief).

Patton alleges that Reesor, Schmuhl, Thompson, and Kehr were acting within the scope of their employments at all times.  And each of Patton's state law claims all arise out of the execution and submission of the allegedly false probable cause affidavit and charging information.  That conduct constitutes the initiation of a judicial proceeding under the ITCA.  *See Whitlock v. Brown*, No. 07-CV-4-AS-APR, 2008 WL 2626656, at *7 (N.D. Ind. June 27, 2008) ("The Court finds that the arrests in this case were the result of a judicial proceeding because, by filing his probable cause affidavit with the prosecutor, Officer Brown initiated a proceeding for the purpose of obtaining such remedy as the law allows—in this case, an arrest warrant."); *Todisco v. Plainfield Police Dep't*, No. 22-cv-386, 2012 WL 1100716, at *4 (S.D. Ind. Mar. 30, 2012) (citing *Whitlock*, 2008 WL 2626656).

Patton's state law claims are therefore all barred by the ITCA.  *See Katz-Crank*, 2014 WL 1324283, at *6 (citing *Sims v. Barnes*, 689 N.E.2d 734, 736 (Ind. Ct. App. 1997)) (dismissing all of plaintiff's claims under the ITCA because they were "all based upon allegations that she was wrongfully prosecuted because there was no probable cause to prosecute her"); *see also Windle v. Ind.*, No. 18-cv-1212, 2019 WL 6724605, at *8 (S.D. Ind. Dec. 10, 2019) ("Both state and federal

courts have held that this immunity bars Indiana claims for malicious prosecution and abuse of process against state entities and employees acting within the scope of their employment." (citing *Katz-Crank v. Haskett*, 843 F.3d 641, 651 (7th Cir. 2016))).

Defendants further argue Patton's defamation claim should be dismissed because Patton did not identify any allegedly defamatory statements. The Court agrees. Patton primarily complains that the filing of intimidation charges falsely characterized him as a criminal, not that any of the Defendants made false statements about him.  (Filing No. 91-1 at ¶ 197.) The Indiana Supreme Court has held that a plaintiff must "set out the operative facts of the claim.  Indeed, hornbook law stresses the necessity of including the alleged defamatory statement in the complaint. . . .  The court is handicapped without the statement since, without it, the court cannot actually determine if the statement is legally defamatory." *Trail v. Boys & Girls Clubs of Nw. Ind.*, 845 N.E.2d 130, 136–37 (Ind. 2006).

Even if Patton's Fourth Amended Complaint were generously read to allege that the statements or omission in the probable cause affidavit and charging information were the defamatory statements, the ITCA would shield Defendants from liability for those statements.  Ind. Code 34-13-3-3(a)(6); *see Katz-Crank*, 2014 WL 1324283, at *6; *Hedges v. Rawley*, 419 N.E.2d 224, 227 (Ind. Ct. App. 1981) (finding that assistant superintendent of city sewage treatment plant who made statements to county prosecutor accusing plant employees of theft, which formed basis of probable cause determination, was shielded from liability for malicious prosecution under predecessor to Indiana Code § 34-13-3-3(a)(6)).

Patton's state law tort claims must therefore be **dismissed**.

### 2.   <u>Federal Malicious Prosecution</u>

Patton does not specify whether his Count XV for malicious prosecution is alleged under both state law and federal law, but the Court liberally construes Patton's Fourth Amended

Complaint as doing so.  Thompson is the only defendant to argue that Patton's federal malicious prosecution claim should be dismissed.

### a.   Whether Patton May Assert a Federal Malicious Prosecution Claim

Thompson argues Patton has not asserted a cognizable federal claim for malicious prosecution for two reasons.  First, citing *Serino v. Hensley*, 735 F.3d 588 (7th Cir. 2013), Thompson argues that Patton "do[es] not have a federal right not to be summoned into court and prosecuted without probable cause."  735 F.3d at 592.  Second, he argues that to the extent Patton challenges the constitutionality of his arrest, he is limited to asserting a Fourth Amendment false arrest claim.  Neither of Thompson's arguments convinces the Court that Patton cannot assert a federal malicious prosecution claim.

First, *Serino* discussed malicious prosecution claims brought under the Fourteenth Amendment.  The plaintiff in *Serino* alleged that his prosecution without probable cause deprived him of liberty or property interests under the Due Process Clause, but the Seventh Circuit concluded that individuals do not have a Fourteenth Amendment right not to be prosecuted without probable cause, and that the plaintiff failed to "allege something else that does amount to a constitutional violation."  *Id.* at 593.  Patton has not alleged a violation of his liberty or property interests, and therefore cannot sustain a malicious prosecution claim under the Fourteenth Amendment.  But as the United States Supreme Court very recently held, malicious prosecution claims may be asserted under the Fourth Amendment.  *Thompson v. Clark*, 142 S. Ct. 1332 (2022).

"[A] Fourth Amendment claim under § 1983 for malicious prosecution, sometimes referred to as a claim for unreasonable seizure pursuant to legal process," has been recognized by Supreme Court precedent.  *Id.* at 1337.  Like with all other Fourth Amendment claims, a plaintiff asserting a Fourth Amendment malicious prosecution claim must allege a seizure.  *Id.* at 1337 n.2 ("Because this claim is housed in the Fourth Amendment, the plaintiff also has to prove that the malicious

prosecution resulted in a seizure of the plaintiff.").  Patton has sufficiently alleged he was arrested, which constitutes a seizure, and permits Patton to assert a Fourth Amendment claim of malicious prosecution.

Thompson's second argument—that Patton may not assert a federal malicious prosecution claim because he has also asserted a false arrest claim—is also unsuccessful.  Fourth Amendment claims of false arrest typically only "cover the time of detention until the issuance of process or arraignment."  *Wallace v. Kato*, 549 U.S. 384, 390 (2007).  But "[i]n *Manuel v. City of Joliet*, the Supreme Court clarified that 'detention without probable cause violates the Fourth Amendment "when it precedes, but also when it follows, the state of legal process in a criminal case."'" *Jones v. York*, 34 F.4th 550, 563–64 (7th Cir. 2022) (quoting *Lewis v. City of Chicago*, 914 F.3d 472, 474 (7th Cir. 2019) (quoting *Manuel*, 137 S. Ct. at 918)).  The arrest warrant against Patton started the legal process against Patton, and Patton is permitted to assert a Fourth Amendment malicious prosecution claim regarding his arrest and any subsequent detention without probable cause.

### b.   Whether Patton Has Sufficiently Alleged a Fourth Amendment Claim of Malicious Prosecution

Having concluded that Patton may assert a malicious prosecution claim under the Fourth Amendment, the Court must determine whether Patton has sufficiently alleged such a claim. The Supreme Court, in *Thompson*, outlined the elements of a Fourth Amendment malicious prosecution claim, which mirror the elements of the state law claim:  "(i) the suit or proceeding was 'instituted without any probable cause'; (ii) the 'motive in instituting' the suit 'was malicious,' [meaning] without probable cause and for a purpose other than bringing the defendant to justice; and (iii) the prosecution 'terminated in the acquittal or discharge of the accused." *Id.* at 1338.  Each of the Defendants argues that Patton has failed to sufficiently allege the elements of a state law claim for malicious prosecution, and the Court will consider those arguments in determining

whether Patton has sufficiently alleged a Fourth Amendment malicious prosecution claim ([Filing No. 103 at 28](#)–29; [Filing No. 106 at 14](#)–15; [Filing No. 113 at 7](#)).

As to the first element, the IU Defendants (and Thompson by reference) argue they did not "initiate" the criminal prosecution, and that only a prosecutor may do so. The IU Defendants are generally correct. In limited circumstances, liability for malicious prosecution may attach to non-prosecutors who provide false information on which the prosecutor relies in deciding to initiate proceedings. That exception, however, does not apply here. According to Patton, Kehr was a member of Defendants' conspiracy to falsely arrest and prosecute him. Kehr did not initiate proceedings against Patton in alleged reliance on false information from the IU Defendants or Thompson, so liability for malicious prosecution does not attach to them. The Prosecutor's Office and Kehr are shielded from this Section 1983 claim liability by sovereign and prosecutorial immunity, so Patton's federal claim for malicious prosecution must therefore be **dismissed**.

## IV.   CONCLUSION

A motion to dismiss pursuant to Rule 12(b)(6) does not test whether the plaintiff will prevail on the merits but instead whether the claimant has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). For the reasons discussed above, the Court **GRANTS** State Defendants Jeff Kehr and Monroe County Prosecutor's Office Motion to Dismiss Plaintiff's Fourth Amended Complaint, ([Filing No. 112](#)) and all claims against the Monroe County Prosecutor's Office and Kehr in his official and individual capacities are **DISMISSED with prejudice**. The **Clerk is directed to terminate** Defendants Jeff Kehr and Monroe County Prosecutor's Office from this action.

The Court **GRANTS in part and DENIES in part** the University, IUPD, Reesor, And Schmuhl's Motion To Dismiss Fourth Amended Complaint IU Defendants' ([Filing No. 102](#)) and Defendant Bobby Thompson's Motion to Dismiss the Plaintiff's Fourth Amended Complaint

(Filing No. 105). With respect to Patton's Section 1983 claims, the Court **DISMISSES with prejudice**: Counts I, V–IX, XI as to IU and the IUPD; Count I as to Schmuhl and Thompson in their individual and official capacities as to compensatory and punitive damages; Counts V–VII and XI as to Reesor, Schmuhl, and Thompson in their official capacities; and Counts XII–IX as to all IU Defendants and Thompson.  With respect to Patton's Title VI claims, the Court **DISMISSES with prejudice**: Count II as to the IUPD, and Reesor, Schmuhl, and Thompson in their official and individual capacities; and Count XII as to Reesor, Schmuhl, and Thompson in their official and individual capacities.  With respect to Patton's ADA and Rehabilitation Act claims, the Court **DISMISSES with prejudice**: Counts III–IV against the IUPD, Schmuhl and Thompson in their official and individual capacities, Reesor in her individual capacity, and Reesor in her official capacity as to compensatory and punitive damages; and Counts XIII–XIV as to Reesor, Schmuhl, and Thompson in their individual capacities, and Reesor, Schmuhl, and Thompson in their official capacities as to compensatory and punitive damages. With respect to Patton's tort claims, the Court **DISMISSES with prejudice** Counts X, XV, and XVI.

The Court **DENIES** the IU Defendants' and Thompson's Motions as to the following, and these claims survive the initial hurdle of a motion to dismiss:

Count I: §1983 Free Speech Retaliation against Reesor in her individual capacity and against Reesor in her official capacity as to claims for prospective injunctive relief only;

Count II: Title VI Civil Rights Act as to IU;

Count III: Title II ADA; and Count IV: Sec. 504 Rehabilitation Act; against IU and against Reesor in her individual capacity as to claims for prospective injunctive relief only;

Count V: §1983 1st Amendment Retaliatory Arrest; Count VI: §1983 First Amendment Retaliatory Prosecution; Count VII: §1983 4th Amendment False Arrest Counts and Count XI:

§1983 Conspiracy to Injure Using Unlawful Means against Reesor, Schmuhl, and Thompson in their individual capacities and against Reesor, Schmuhl, and Thompson in their official capacities as to claims for prospective injunctive relief only;

Count XII: Civil Rights Act as to IU and IUPD; and

Count XIII: Title II-ADA; and Count XIV: Sec. 504 Rehabilitation Act against IU, IUPD, and Reesor, Schmuhl, and Thompson in their official capacities as to claims for prospective injunctive relief only.

Patton's requests for prospective injunctive relief are limited to his requests for readmission to the University and the removal of the denial of his petition for readmission and his arrest and prosecution for intimidation from his student disciplinary records. Whether or not these claims can survive summary judgment is a matter for another day. The Court sets a new deadline of **December 28, 2022** for any summary judgment motions and the parties should contact the Magistrate Judge to discuss any other case management deadlines.

**SO ORDERED.**

Date:    8/29/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Daven A. Patton
3517 St. Thomas Blvd., Apt. B
Indianapolis, Indiana  46214

Curtis Matthew Graham
FREEMAN MATHIS & GARY, LLP
cgraham@fmglaw.com

Vivek Randle Hadley
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
vhadley@taftlaw.com

Gustavo Angel Jimenez
INDIANA ATTORNEY GENERAL'S OFFICE
gustavo.jimenez@atg.in.gov

Ann O. McCready
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
amccready@taftlaw.com

Kayla D Moody-Grant
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
KMoody-Grant@taftlaw.com

Casey C. Stansbury
FREEMAN MATHIS & GARY, LLP
cstansbury@fmglaw.com

Jeffrey D. Stemerick
TAFT STETTINIUS & HOLLISTER LLP (Indianapolis)
jstemerick@taftlaw.com